# SUPREME COURT OF THE UNITED STATES

No. 25A269

DEPARTMENT OF STATE, ET AL. *v.* AIDS VACCINE ADVOCACY COALITION, ET AL.

ON APPLICATION FOR STAY

[September 26, 2025]

On September 3, the United States District Court for the District of Columbia entered a preliminary injunction directing the Executive to obligate roughly $10.5 billion of appropriated aid funding set to expire on September 30. Of that $10.5 billion, $4 billion was proposed to be rescinded in a "special message" transmitted pursuant to the Impoundment Control Act. See 2 U. S. C. §681 *et seq*. After the District Court and the United States Court of Appeals for the District of Columbia Circuit denied stays of that order, the Government filed this application to stay the District Court's injunction. The application for stay presented to THE CHIEF JUSTICE and by him referred to the Court is granted. The Government, at this early stage, has made a sufficient showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue here. The Government has also made a sufficient showing that mandamus relief is unavailable to respondents. And, on the record before the Court, the asserted harms to the Executive's conduct of foreign affairs appear to outweigh the potential harm faced by respondents. This order should not be read as a final determination on the merits. The relief granted by the Court today reflects our preliminary view, consistent with the standards for interim relief.

The District Court's September 3, 2025 order granting a
preliminary injunction in case Nos. 1:25–cv–400 and 1:25–
cv–402 is stayed as to the funding subject to the President's
August 28 special message, pending the disposition of the
Government's appeal in the United States Court of Appeals
for the District of Columbia Circuit and disposition of a
petition for a writ of certiorari, if such writ is timely sought.
Should the petition for a writ of certiorari be denied, this
stay shall terminate automatically.  In the event certiorari
is granted, the stay shall terminate upon the sending down
of the judgment of this Court.

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR and
JUSTICE JACKSON join, dissenting from the grant of the ap-
plication for stay.

This emergency application raises novel issues funda-
mental to the relationship between the President and Con-
gress.  It arises from the refusal of the President and his
officers to obligate and spend billions of dollars that Con-
gress appropriated for foreign aid.  Prospective beneficiar-
ies of those funds challenged the decision to withhold them
as an unlawful impoundment—essentially, a Presidential
usurpation of Congress's power of the purse.  The main le-
gal question presented in this application involves the
meaning and effect of a statute concerning impoundments:
More specifically, the question is whether that statute pre-
cludes the beneficiaries' suit to make the Executive comply
with appropriations laws.  This Court, before today, has
dealt with the statute only in passing; neither have lower
courts much addressed it.  Deciding the question presented
thus requires the Court to work in uncharted territory.
And, to repeat, the stakes are high: At issue is the allocation
of power between the Executive and Congress over the ex-
penditure of public monies.

As even that much suggests, this case is not a likely can-
didate for a grant of emergency relief.  Per usual on our

KAGAN, J., dissenting

emergency docket, we have had to consider this application on a short fuse—less than three weeks. We have done so with scant briefing, no oral argument, and no opportunity to deliberate in conference. Because of how this case came to us, we likewise do not have the benefit of a pertinent court of appeals decision, much less a set of decisions expressing different views. In a few weeks' time—when we turn to our regular docket—we will decide cases of far less import with far more process and reflection. The Court today carries on regardless, staying the District Court's ruling that the Executive must obligate the disputed funds. To its credit, the majority emphasizes in its order that it has reached only a "preliminary view" of the issues raised, which should not be read as a "final determination on the merits." *Ante,* at 1. But even at that, the majority goes too far. The Executive has not met our standard for emergency relief—the appropriately high bar we have erected because a stay like this one disrupts "the ordinary processes of administration and judicial review." *Nken* v. *Holder*, 556 U. S. 418, 427 (2009). The Executive has not "made a strong showing that [it] is likely to succeed on the merits." *Id.*, at 426. Nor has it shown that, in the absence of relief, it will suffer irreparable harm. We therefore should have denied this application, allowed the lower courts to go forward, and ensured that the weighty question presented here receives the consideration it deserves.

Begin with what is at issue. This case arose because the President and his officers do not want to spend all the foreign-aid funds Congress deemed proper. In 2024, Congress appropriated more than $30 billion for foreign assistance. See Further Consolidated Appropriations Act, 2024, Pub. L. No. 118–47, div F, tits. III–IV, 138 Stat. 740–750. But on his first day in office, the President froze all that funding pending a full-scale executive review. See Exec. Order No. 14169, 90 Fed. Reg. 8619 (2025). Organizations accustomed to receiving foreign-aid monies sued under the

Administrative Procedure Act (APA), requesting that the
District Court compel the obligation and expenditure of the
funds Congress had appropriated. The controversy has sig-
nificantly narrowed since that time, as the Executive has
resumed making various obligations and grants. The re-
maining dispute concerns $4 billion of foreign-aid appropri-
ations, which the President recently requested that Con-
gress rescind. Congress has not acted on that request, thus
leaving the appropriation intact. Under the District Court's
most recent order, the Executive must obligate the $4 bil-
lion before the end of the fiscal year (September 30), when
it would otherwise become unavailable for spending. The
stay the majority grants today suspends that court order.
The effect is to prevent the funds from reaching their in-
tended recipients—not just now but (because of their im-
pending expiration) for all time.

The Executive's principal argument for a stay is that the
Impoundment Control Act of 1974 (ICA), 2 U. S. C. § 681
*et seq.*, precludes the organizations from bringing this APA
suit to enforce appropriations laws. The ICA, enacted after
Congress waged war with President Nixon over impound-
ments, has two components. First, the Act sets up a way
for a President to propose and Congress to consider changes
in the funding levels that existing laws set. Briefly put, the
President sends a "special message" to Congress asking for
a rescission—just as happened here with respect to the $4
billion. § 683(a). And for the next 45 days, any bill accept-
ing the President's proposal receives expedited congres-
sional review through fast-track procedures. See
§§ 682(3), 688.[1]    Second, the Act gives the Comptroller

---

[1] The special message does not itself alter spending requirements. Sec-
tion 683(b) provides that any funds the President has "proposed to be
rescinded . . . shall be made available for obligation unless, within the
prescribed 45-day period," Congress adopts the proposal. In other words,
Congress's action on the proposal is needed to relieve the Executive of its
duty under an appropriations law to obligate funds.

General (a legislative officer) a way to sue over presidential impoundments. If he believes the President is unlawfully withholding funds, he is to send a report to Congress saying so. See § 686. And after a specified time, he may bring a civil action under the Act to compel the Executive to obligate the funds at issue. See § 687. According to the Executive's application for a stay, that statutory scheme "impliedly preclude[s]" the plaintiff organizations from bringing an APA suit to similarly enforce appropriations laws. Application 18. That suit, the Executive argues, would "supplant[ ] interbranch negotiations" and "leap-frog[ ] the Comptroller General" if allowed to go forward. *Id.*, at 20.[2]

But the text of the ICA refutes that notion. As against the Executive's argument about "implied" meaning are the statute's express words. In its very first section, titled "Disclaimer," the ICA declares: "Nothing contained in this Act . . . shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment." § 681(3). It is hard to write a clearer and a more emphatic *non*-preclusion provision than that. *Nothing* in the ICA (neither its process for considering proposed rescissions nor its creation of a Comptroller General suit) affects *in any way* the claims of *any* party to litigation about

————————

[2] The Executive only recently devised that argument; just last month, in the Court of Appeals, the Executive took the opposite view, stating that the ICA permits private APA suits to enforce appropriations laws. See Response to Petition for Rehearing En Banc in No. 25–5097 etc. (CADC), pp. 15–16. At that time, the Executive explained that the ICA does not allow private plaintiffs to "enforce the ICA" itself (the issue then in dispute). *Id.*, at 15. But such plaintiffs, the Executive continued, still retain "preexisting" (*i.e.*, non-ICA) rights "to enforce statutory [funding] obligations through a suit under the APA." *Id.*, at 16. So at a private plaintiff's request, a "court could enjoin a refusal to spend appropriated funds where the relevant [appropriations] statutes required that the funds be spent." *Id.*, at 15–16. That, of course, is precisely what the plaintiff organizations argue here.

*any* impoundment.  So as applied here, nothing in the ICA
has any effect on the claims of the plaintiff organizations
("any party") to sue over the President's withholding of ap-
propriated foreign-aid funds ("any impoundment").  All the
Executive can argue in response is that the provision con-
tains an unspoken limit, depriving it of any current effect.
According to the Executive, the Disclaimer really applies
only to litigation pending at the time the ICA was enacted—
not to later suits like this one.  See Application 22.  "But
this Court may not narrow a provision's reach by inserting
words Congress chose to omit."  *Lomax* v. *Ortiz-Marquez*,
590 U. S. 595, 600 (2020).  It would have been easy enough
to draft the statute the Executive wants—just add the
words "currently pending" before "litigation."  Congress did
not do so.  Nor did it express the same idea in some other
way.  The words it chose apply as well to this present-day
litigation as to suits brought a half-century ago.  All are al-
lowed.

And reading the Disclaimer as its text demands creates
no conflict with the rest of the ICA.  Yes, Congress in that
statute gave the Executive a way to propose changes in en-
acted appropriations levels.  See § 683.  But that mecha-
nism suggests precious little about how Congress thought
appropriations laws should be enforced when, as here, it
has not adopted such a proposal.  And yes, Congress author-
ized the Comptroller General to bring suit under the statute
for the Executive's failure to obligate appropriated funds.
See § 687.  But government enforcement efforts often co-ex-
ist with private ones as to the same or similar subject mat-
ter, proceeding along parallel tracks.  There is nothing
strange about giving the Comptroller General the ability to
challenge impoundments under the ICA while leaving af-
fected private parties free to do so under the APA's

longstanding authority.[3]  So even if the Disclaimer provision did not exist, the Executive's argument would be tenuous.  With the Disclaimer—remember, "nothing" in the ICA shall "affect[] in any way" the claims of "any party" over "any impoundment," § 681(3)—the argument becomes well-nigh impossible to sustain.

And just to gild the lily:  The ICA's historical context explains why Congress made so clear that it was not precluding other parties' suits.  The ICA emerged against the backdrop of President Nixon's large-scale efforts to impound appropriated funds, and thus to substitute his own policy priorities for Congress's.  See A. Schick, Congress and Money: Budgeting, Spending and Taxing 29, 46–49 (1980).  That effort sparked a fierce congressional reaction.  See L. Fisher, Presidential Spending Power 147 (1975).  But even before Congress could assert its prerogatives through legislation, suits brought by States, organizations, and individuals—more than 60 of them by Congress's careful count—put the President on his back foot.[4]  As Congress knew, courts consistently rejected the President's claim of constitutional power to impound monies, reasoning that the President has a duty to follow appropriations laws as he does any others.[5]  The dispositive issue in the suits thus became whether a given appropriations law indeed mandated spending, or instead provided the Executive with some discretion.  And the Executive often lost on that issue too.  See, *e.g.*, *Train* v. *City of New York*, 420 U. S. 35, 42–46 (1975).  In the end, the mass of litigation contributed significantly

---

[3] Note again that just last month that was how the Executive itself thought the statute works.  See *supra*, at 5, n. 2.

[4] See Joint Committee on Congressional Operations, Special Report on Court Challenges to Executive Branch Impoundments of Appropriated Funds, 93d Cong., 2d Sess., 1 (Comm. Print 1974).

[5] See House Committee on Government Operations, Report on Presidential Impoundment of Congressionally Appropriated Funds: An Analysis of Recent Federal Court Decisions, 93d Cong., 2d Sess., 1 (Comm. Print 1974).

to President Nixon's decision to "abandon the impoundment tactic," as even his Budget Director acknowledged. See B. Graham, White House Backing Off Impounding, Washington Post, June 30, 1974, p. A2 (reporting on speech by Roy Ash). Congress followed up by enacting the ICA in order to (as its title says) "control" future impoundments. But it is hardly surprising that in so doing Congress disclaimed any intent to interfere with other parties' suits to enforce appropriations laws. Suits of that kind had helped Congress win its confrontation with the President—and Congress knew could do so again.

The Executive's argument about irreparable harm and the balance of equities fares no better. The Executive says that to comply with the District Court's order to obligate the $4 billion, it will have to "enter into negotiations" with "foreign states or international organizations." Application 35. And in those discussions, the Executive protests, it will have to "advocate against its own objectives"—"undermin[ing]" its real view that the expenditures are "contrary to U. S. foreign policy." *Id*., at 3, 34–35. But that is just the price of living under a Constitution that gives *Congress* the power to make spending decisions through the enactment of appropriations laws. If those laws require obligation of the money, and if Congress has not by rescission or other action relieved the Executive of that duty, then the Executive must comply. It cannot be heard to complain, as it does here, that the laws clash with the President's differing view of "American values" and "American interests." *Id*., at 34. That inconsistency, in other words, is not a cognizable harm, to be weighed in the equitable balance. It is merely a frustration any President must bear.

For those reasons, the Executive has not shown what it must to receive emergency relief from this Court. That kind of relief should be sparingly given. As earlier noted, every such award disrupts the usual process of judicial review. And no such award emerges from our normal hallmarks of

KAGAN, J., dissenting

deliberation. So the standard for granting emergency relief is supposed to be stringent. The Executive has not come close to meeting it here. And the consequence of today's grant is significant. I appreciate that the majority refrains from offering a definitive view of this dispute and the questions raised in it. But the effect of its ruling is to allow the Executive to cease obligating $4 billion in funds that Congress appropriated for foreign aid, and that will now never reach its intended recipients. Because that result conflicts with the separation of powers, I respectfully dissent.